UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
TEVON THOMAS, MATTHEW NELSON,
BILLY HIPPOLYTE, ALISHEA WALTERS
GARY JEANTY, MILTON SEARS, DAVID
ALCINDOR , ALONZO SEALEY,  14 CV 7513 (ENV) (VMS)
SHELDON NYACK, RAVIN COX, ZANDA
DEWAR, ALI KETTRLES, HERBY AIME,
JOBE LEEMOW, MARKOUS FRAY,
DWYTE PILGRIM, BRANDON THOMAS,
RYAN CLYNE, and LLOYD HENRY  **AMENDED COMPLAINT**

      Plaintiffs,

  -against-

THE CITY OF NEW YORK, JOEBIAN
ORTIZ, and ALREDO SKELTON,
              **PLAINTIFFS DEMAND**
      Defendants.     **A TRIAL BY JURY**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

  Plaintiffs Tevon Thomas, Matthew Nelson, Billy Hippolyte, Gary Jeanty, Milton Sears, David Alcindor, Alonzo Sealey, Sheldon Nyack, Ravin Cox, Zanda Dewar, Ali Kettrles, Herby Aime, Jobe Leemow, Markous Fray, Dwyte Pilgrim, Brandon Thomas, Ryan Clyne, and Lloyd Henry, by their attorneys, Lumer & Neville, as for their Amended Complaint hereby allege upon information and belief:

### PARTIES, VENUE and JURISDICTION

  1. At all times hereinafter mentioned, each of the afore mentioned plaintiffs were adult residents of Kings County, in the State of New York, or were otherwise lawfully thereat.

  2. Plaintiff Alishea Walters is currently a plaintiff in the instant action but,

while previously represented by Lumer & Neville, is no longer represented by Lumer & Neville, and none of the claims in this amended pleading are alleged on her behalf.

3. At all relevant times hereinafter mentioned, defendant City of New York ("New York City"), was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York and acts by and through its agencies, employees and agents, including, but not limited to, the New York City Police Department ("NYPD"), and their employees.

4. At all relevant times hereinafter mentioned, defendant Joebian Ortiz (Tax 894360), was employed by the City of New York as a member of the NYPD and assigned to Brooklyn South Gang Squad ("BSGS"). Defendant Ortiz is sued herein in his official and individual capacities.

5. At all relevant times hereinafter mentioned, defendant Alfredo Skelton (Shield 29533), was employed by the City of New York as a member of the NYPD and assigned to the Emergency Service Unit ("ESU"). Defendant Skelton is sued herein in his official and individual capacities.

6. This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1343, and 42 U.S.C. § 1983.

7. Venue is properly laid, pursuant to 28 U.S.C. Section 1391, et seq. in the Eastern District of New York, where defendant City of New York resides, and where the majority of the actions complained of herein occurred.

## RELEVANT FACTS

8. On May 15, 2014, during the evening hours, each of the plaintiffs was lawfully present inside of or in the backyard of a three-story private residence located at or about 641 East 59 Street, in Brooklyn, New York (the "Premises").

9. At this time, various members of the NYPD arrived at the Premises in several NYPD vehicles, entered the premises with guns drawn, and seized each of the plaintiffs, along with other individuals who also present.

10. The entry into the Premises was made, upon information and belief, pursuant to a warrant that was procured by members of the BSGS, including Ortiz.

11. The initial entry into the Premises was carried out by Skelton and various members of the ESU.

12. Immediately prior to the defendants' arrival at, and entry into, the Premises, many of the plaintiffs were present in the backyard of the Premises while others were present throughout the multi-story residence.

13. As they approached and entered the Premises, Skelton and his ESU colleagues seized the plaintiffs, and other civilians present outside and inside the Premises.

14. Certain of the individuals were handcuffed and detained outside the Premises by the ESU officers, while others were first cuffed and then moved into other rooms and areas within the Premises.

15. None of the plaintiffs were engaged in any unlawful or suspicious activity.

16. Although there was no legal basis to seize the plaintiffs, defendants handcuffed the plaintiffs and took them into custody.

17. Sometime after seizing the plaintiffs, both those inside as well as the plaintiffs outside the Premises, the ESU officers withdrew from the Premises and turned control over the scene to members of the BSGS, including Ortiz.

18. The defendants searched the plaintiffs, or caused them to be searched. The searches yielded no evidence of guns, drugs, or any other contraband on any of the plaintiffs' persons.

19. Despite the absence of any evidence of wrongdoing on the part of the plaintiffs, the defendants formally arrested the plaintiffs, as well as eleven other individuals.

20. The decision to seize the plaintiffs and take them into custody was objectively unreasonable under the circumstances.

21. Plaintiffs Matthew Nelson, Billy Hippolyte, and Gary Jeanty, were each held for a period of many hours until the defendants released them from custody at the scene of the arrest without causing these three plaintiffs to be criminally charged.

22. Plaintiffs Nelson, Hippolyte, and Jeanty, were each seized outside the Premises and, for the entire period of their detention were kept outside the Premises, even after searches of their person failed to yield any contraband of any sort.

23. The handcuffed detention of plaintiffs Nelson, Hippolyte, and Jeanty, continued even after ESU had finished securing the inside of the Premises and turned the scene over to the BSGS, and said detention continued for a period of hours until BSGS left

4

the scene, at which time the BSGS finally released these plaintiffs from the defendants' custody.

24. The continued detention of plaintiffs Nelson, Hippolyte, and Jeanty, who were not engaged in any criminal activity and were simply found outside a building where a search was occurring, was without any legal basis and without any reasonable basis to believe that such detention was lawful or permissible.

25. The remaining plaintiffs, as well as the various other arrested individuals, were transported by the defendants to a local area NYPD station house, where they formally arrested and charged by the defendants, despite the absence of probable cause for their arrests.

26. Five of the plaintiffs, Alonzo Sealey, Brandon Thomas, Dwyte Pilgrim, Ryan Clyne, and Lloyd Henry, were, upon information and belief, eventually issued Desk Appearance Tickets ("DATs") which required them to appear in court at a later date, and then released.

27. The DATs were issued based on the knowingly false allegations that each of these plaintiffs were in criminal possession of narcotics, gambling paraphernalia, or other contraband, or had otherwise engaged in criminal conduct, when, in fact, none of these allegations were true, and the defendants knew and understood that there was no basis for these plaintiffs' arrest or the issuance of the DATs.

28. Upon information and belief, the Kings County District Attorney ("KCDA") declined to charge these five plaintiffs (Alonzo Sealey, Brandon Thomas, Dwyte

Pilgrim, Ryan Clyne, and Lloyd Henry), and the DATs were never docketed or were otherwise dismissed prior to these plaintffs' actual appearance before the court on the DAT return dates.

29. All of the remaining plaintiffs, as well as various other individuals arrested at the Premises, were transported to Kings County Central Booking, where they were held in anticipation of arraignment.

30. After a period of many hours, the KCDA declined to prosecute plaintiffs Ali Ketterles, and he was released from custody without being criminally charged.

31. Defendant Ortiz had made the decision to arrest Ketterles despite his knowledge that Ketterles was not engaged in any criminal conduct and that there was no reasonable basis to believe that probable cause for Ketterles's arrest existed.

32. While the plaintiffs, or at least those not otherwise issued DATs, were in defendants' custody, defendant Joebian Ortiz drafted arrest paperwork concerning the arrest of various plaintiffs, including not only Ketterles and other persons, but also Tevon Thomas, Herby Aime, David Alcindor, Jobe Leemow, and Milton Sears. In this paperwork, Ortiz falsely claimed, in part, that this latter group of plaintiffs had jointly possessed more than a pound of marijuana which Ortiz claimed was recovered from a living room closet in the Premises.

33. This claim by Ortiz was materially false, as none of these plaintiffs had actually or constructively possessed this contraband nor been present in the room where the closet in which the contraband was found was located, and there was no factual basis for

6

Ortiz to reasonably believe these plaintiffs possessed the marijuana.

34. While plaintiffs were in defendants' custody, defendant Joebian Ortiz drafted arrest paperwork concerning the arrest of plaintiffs Markus Fray, Sheldon Nyack, Ravin Cox, and Zanda Dewar. In this paperwork, Ortiz falsely claimed, in part, that these plaintiffs had also jointly possessed more than a pound of marijuana, which Ortiz now sometimes claimed was recovered from the same living room closet, and other times from a book bag inside a bedroom closet.

35. This claim by Ortiz was materially false, as none of these plaintiffs had actually or constructively possessed this contraband, and as none of the plaintiffs were present in the room where the closet in which the contraband was found was located, and there was no factual basis for Ortiz to reasonably believe these plaintiffs possessed the marijuana.

36. Ortiz further claimed that these plaintiffs (Fray, Nyack, Cox, and Dewar) also possessed a loaded and operable handgun, based on the statement he claimed was relayed to him by defendant Skelton.

37. Ortiz swore that Skelton told him that Skelton had recovered a handgun underneath a sweatshirt that was itself underneath plaintiff Fray, after Fray had been placed on the ground.

38. This statement was materially false, as Skelton has denied under oath that he recovered a handgun and has further denied telling Ortiz that he recovered a handgun, either from or near Fray, or from anywhere else in the premises.

Case 1:14-cv-07513-ENV-VMS   Document 33   Filed 04/18/16   Page 8 of 17 PageID #: 174

39. In fact, virtually every single claim by Ortiz as to where the plaintiffs were located when the entry was made was materially false. As the defendants were well aware, some of the plaintiffs were seized in various rooms, hallways, and doorways of the Premises, while others were outside when the defendants arrived. At least some, if not all of these plaintiffs were moved and directed into various rooms immediately upon their seizure by the defendants, so that they were searched in rooms and locations other than where they were when the defendants entered.

40. Moreover, ESU's records concerning the location of the plaintiffs, and other individuals seized inside the premises at the time of their seizure, directly contradict the claims made by Ortiz to the KCDA as to where the plaintiffs were found, which was the entire basis of the Ortiz's stated basis for probable cause for their arrests.

41. Indeed, as Skelton, or whichever member of ESU actually seized Fray upon the defendants' initial entry, approached Fray observed another person throw the gun away so that it landed near Fray. Any gun that may have been recovered thereafter near Fray was therefore not recovered from Fray's possession nor had Fray ever had actual or constructive possession of that handgun, as the defendants were well aware of that at the time Ortiz drafted the arrest paperwork.

42. Ortiz then forwarded, or caused to be forwarded to the KCDA these false factual statements, including those made in support of the DATs, in order to justify the arrests and to persuade the KCDA to commence the plaintiffs' criminal prosecutions, as well as the prosecutions of the other individuals arrested with plaintiffs.

8

43. Ortiz knew and understood that the KCDA was relying on Ortiz and his fellow officers to provide accurate and truthful information, and not to omit evidence or facts that may be favorable to those persons under arrest, or otherwise withhold information or mislead the KCDA in any way with respect to the facts and circumstances surrounding the arrest of the plaintiffs.

44. Notwithstanding this knowledge, Ortiz lied to the KCDA about where plaintiffs were found, where the contraband was found, and the circumstances of the arrests and searches, in order to fabricate a basis for their arrest and prosecution.

45. Ortiz then spoke with the KCDA and reiterated and confirmed these false statements to the KCDA to justify the arrests and to persuade the KCDA to initiate the plaintiffs' prosecutions.

46. Based on the fabricated claims of marijuana possession, plaintiffs Tevon Thomas and Herby Aime were each charged with multiple counts of marijuana possession, including at least one felony charge, under docket number 2014KN036196, Milton Sears was similarly charged under 2014KN036188, as weere David Alcindor and Jobe Leemow under 2014KN036220.

47. Based on the fabricated claims of marijuana and gun possession, plaintiffs Fray and Nyack were each charged with multiple counts of marijuana and weapons possession, including at least one felony charge, under docket number 2014KN036200, Zanda Dewar was similarly charged under 2014KN036178, and Ravin Cox was charged with gun possession under 2014KN036192.

48. As a result of these serious felony charges, many of the plaintiffs were detained at KCCB or at a Department of Corrections facility for a period of several or more days, before they were released.

49. On May 21, 2014, all of the charges for each of these plaintiffs (Tevon Thomas, Sears, Alcindor, Nyack, Cox, Dewar, Aime, Leemow, and Fray) were dismissed, and terminated in plaintiffs' favor.

50. At no time did Ortiz take any steps to intervene in, prevent, or otherwise limit the harms caused by his false statements he had made. or to limit the consequences thereof.

51. At no time did Skelton take any steps to intervene in, prevent, or otherwise limit the harms caused by his false statements Ortiz claims Skelton had made, or to limit the consequences thereof.

52. At no time did the other defendants take any steps to intervene in, prevent, or otherwise limit the misconduct engaged in by Ortiz and Skelton, and/or failed to file accurate or corrective statements, or otherwise failed to report the conduct of the defendants who engaged in the misconduct described herein as required, and at no time did any of these defendants make any effort of any sort to notify the KCDA of the absence of probable cause to arrest these plaintiffs or the falsity of fabricated statements.

53. At no time did there exist any basis to utilize any level of force against the plaintiffs, much less the force actually employed, nor could any of the defendants have reasonably believed that such force was necessary. As a result of the excessive use of force

employed by the defendants, several plaintiffs suffered physical injuries.

54. At no time prior to or during the encounter was there probable cause to arrest the plaintiffs.

55. That at all times relevant herein, the defendants were acting within the scope of their employment, and their acts were done in furtherance of the City of New York's interests and without legal justification or excuse.

### FIRST CAUSE OF ACTION

56. Plaintiffs repeat the allegations contained in the preceding paragraphs above as though stated fully herein.

57. The individual defendants willfully and intentionally seized, searched, detained, and arrested the plaintiffs without probable cause, and without a reasonable basis to believe such cause existed.

58. The defendants fabricated evidence through the false statements of Ortiz and/or Skelton, to the effect that the plaintiffs were found to be in possession of marijuana and/or a handgun, and forwarded these to the KCDA, causing plaintiffs to be denied their liberty.

59. Defendants further caused plaintiffs Tevon Thomas, Sears, Alcindor, Nyack, Cox, Dewar, Aime, Leemow, and Fray to be maliciously prosecuted.

60. The individual defendants willfully and intentionally subjected plaintiffs to physical force in excess of what was reasonable under the circumstances and caused these

plaintiffs to suffer physical injuries, and did so without a reasonable basis to believe that such conduct was appropriate, reasonable, lawful, or necessary.

61. At no time did any of the individual defendants make any reasonable attempt to intervene in the unconstitutional conduct of their fellow officers, and thus further facilitated and tacitly encouraged the continuation of the misconduct.

62. By so doing, the individual defendants, individually and collectively, subjected the plaintiffs to false arrest and imprisonment, excessive force, unlawful searches of person and property, malicious prosecution, and the denial of due process through the fabrication of evidence, and thereby violated and aided and abetted in the violation of the plaintiff's rights under the Fourth, Sixth, and Fourteenth Amendments of the United States Constitution.

63. By reason thereof, the individual defendants have violated 42 U.S.C. §1983 and caused the plaintiffs to suffer emotional and physical injuries, mental anguish, incarceration and the deprivation of liberty, and the loss of their constitutional rights.

## SECOND CAUSE OF ACTION

64. Plaintiffs repeat the allegations contained in the preceding paragraphs above as though stated fully herein.

65. Defendant City of New York was responsible for ensuring that reasonable and appropriate levels of supervision were in place within and/or over the NYPD.

66. Ortiz's actions in this matter – condoned by and carried out with the approval of the other defendants – were carried out in accordance with an existing plan or policy created or otherwise condoned by the municipal defendant designed to increase the number of arrests made without regard to probable cause.

67. The purpose of this policy or plan was to generate large numbers of arrests to help the NYPD create a false impression of positive activity by their officers.

68. In addition, members of the Gang Division are evaluated, at least in part, on the basis of their "activity" which is measured by the number of arrests made, search warrants secured, and other, similar criteria. Thus, members of the Gang Division routinely Defendant City of New York was responsible for ensuring that reasonable and appropriate levels of supervision were in place within and/or over the NYPD.

69. Ortiz's actions in this matter – condoned by and carried out with the approval of the other defendants – were carried out in accordance with an existing plan or policy created or otherwise condoned by the municipal defendant designed to increase the number of arrests made without regard to probable cause.

70. More precisely, under this policy or plan, officers within the Gang Division (of which the defendants' Brooklyn South Gang Squad is a subdivision) would knowingly make arrests of individuals regardless of whether there was any factual basis for the charges. The arresting officer(s) would then make false statements of fact as to seeing the individual(s) being arrested in actual or constructive possession of the contraband in question.

71. The purpose of this policy or plan was to generate large numbers of arrests to help the NYPD create a false impression of positive activity by their officers.

72. In addition, members of the Gang Division are evaluated, at least in part, on the basis of their "activity" which is measured by the number of arrests made, search warrants secured, and other, similar criteria. Thus, members of the Gang Division routinely make arrests and engage in other police activity without sufficient legal cause in order to raise their levels of "activity" and improve the perception of their job performance.

73. The NYPD generally, and BSGS in particular, tracks the number of arrests made by each officer but does not take into account the outcome of these arrests, even though this information is available to the NYPD. As a result, members of the Gang Division are well aware that (a) they are being evaluated based on, in large part, the number of arrests made, and (b) their supervisors do not care whether these arrests lead to criminal prosecutions, much less convictions.

74. In this case, even if the individual defendants did recover marijuana or a handgun, they engaged in mass arrests of plaintiffs without probable cause as part of parcel of this policy designed to boost their productivity numbers, and then fabricated evidence to attempt to justify the arrests and promote the initiation of the plaintiffs' prosecution.

75. At no time did any of the individual defendants make any reasonable attempt to intervene in the unconstitutional conduct of their fellow officers, and thus further facilitated and tacitly encouraged the continuation of the misconduct, and thereby confirmed the existence of this policy.

76. By reason thereof, the municipal defendant has violated 42 U.S.C. §1983 and caused the plaintiff to suffer emotional and physical injuries, mental anguish, incarceration and the deprivation of liberty, and the loss of their constitutional rights.

## THIRD CAUSE OF ACTION

77. Plaintiffs repeat the allegations contained in the preceding paragraphs above as though stated fully herein.

78. Defendant City of New York had actual or constructive knowledge that there was inadequate supervision over and/or within the NYPD with respect to its members' abuse of their authority in terms of making false arrests and lying to prosecutors to cover up said arrests and cause the malicious prosecution of persons wrongly arrested. Despite ample notice of inadequate supervision, defendants took no steps to ensure that reasonable and appropriate levels of supervision were put place to reasonably ensure that NYPD members engaged in police conduct in a lawful and proper manner, including their use of their authority as law enforcement officers with respect to the general public, including, and specifically, the plaintiff herein.

79. Even if the BSGS policy outlined in the Second Cause of Action herein is not a formal policy of the NYPD, supervisory officers within the Organized Crime Control Bureau, which overseas, in part, the Gang Squad and Narcotics Division, is well aware that its members routinely arrest people without any regard for whether probable cause for those arrests exist, and do so to artificially enhance their productivity numbers.

80. As a result of such conduct, generally, scores of citizens are falsely

arrested and jailed, and often wrongly prosecuted and, almost certainly, wrongly convicted and imprisoned. Notwithstanding their knowledge of the existence of these informal policies and conduct, the City of New York and the NYPD have failed to take any meaningful steps to supervise, investigate, or discipline the offending officers, and are deliberately indifferent to the harms this course of conduct has caused and will continue to cause.

81. Therefore the municipal defendant has not only tolerated, but actively fostered a lawless atmosphere within the NYPD and that the City of New York was deliberately indifferent to the risk that the inadequate level of supervision would lead to the violation of individuals' constitutional rights in general, and caused the violation of the plaintiff's rights in particular.

82. The negligent supervision of, in relevant part, Gang Squad officers by the City of New York and the NYPD, have resulted in the violation of the plaintiffs' rights as set forth herein.

83. By reason thereof, the municipal defendant has violated 42 U.S.C. §1983 and caused the plaintiff to suffer emotional and physical injuries, mental anguish, incarceration and the deprivation of liberty, and the loss of their constitutional rights.

## DEMAND FOR A JURY TRIAL

Pursuant to Fed. R. Civ. P. 38, plaintiffs hereby demand a jury trial of all issues capable of being determined by a jury.

WHEREFORE, the plaintiffs demand judgment against defendants jointly and severally as follows:

    i.    on the first cause of action, actual and punitive damages in an amount to be determined at trial;

    ii.    on the second and third causes of action, actual damages in an amount to be determined at trial;

    iii.    statutory attorney's fees pursuant to, *inter alia*, 42 U.S.C. §1988 and New York common law, disbursements, and costs of this action; and

    iv.    such other relief as the Court deems just and proper.

Dated:  New York, New York
         April 18, 2016

                              LUMER & NEVILLE
                              Attorneys for All Plaintiffs
                              (other than Alishea Walters)

By: _____
                              Michael Lumer, Esq.
                              225 Broadway, Suite 2700
                              New York, New York 10007
                              (212) 566-5060