UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

TEVON THOMAS, MATTHEW NELSON,
BILLY HIPPOLYTE, ALISHEA WALTERS,
GARY JEANTY, MILTON SEARS, DAVID            14 CV 7513 (ENV) (VMS)
ALCINDOR , ALONZO SEALEY,
SHELDON NYACK, RAVIN COX, ZANDA
DEWAR, ALI KETTRLES, HERBY AIME,
JOBE LEEMOW, MARKOUS FRAY,
DWYTE PILGRIM, BRANDON THOMAS,              **SECOND**
RYAN CLYNE, and LLOYD HENRY                 **AMENDED COMPLAINT**

                    Plaintiffs,

          -against-

THE CITY OF NEW YORK, JOEBIAN
ORTIZ, ALFREDO SKELTON, WILLIAM
RUSSO, PETER CARRETTA, and GARY
MARCUS,
                                            **PLAINTIFFS DEMAND**
                    Defendants.             **A TRIAL BY JURY**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

          Plaintiffs Tevon Thomas, Matthew Nelson, Billy Hippolyte, Alishea Walters,

Gary Jeanty, Milton Sears, David Alcindor , Alonzo Sealey, Sheldon Nyack, Ravin Cox,

Zanda Dewar, Ali Kettrles, Herby Aime, Jobe Leemow, Markous Fray, Dwyte Pilgrim,

Brandon Thomas, Ryan Clyne, and Lloyd Henry, by their attorneys, Lumer & Neville, hereby

allege upon information and belief:

## PARTIES, VENUE and JURISDICTION

          1.      Plaintiff Alishea Walters, while a party to this action, is not represented

by Lumer & Neville, and this pleading does not purport to assert any claims on her behalf.

          2.      The term "plaintiffs" as used herein refers to all plaintiffs in this action,

other than Ms. Walters, unless expressly stated otherwise.

3.      At all relevant times hereinafter mentioned, each of the above plaintiffs were adult residents of Kings County and the State of New York, or were otherwise lawfully present therein.

4.      At all relevant times hereinafter mentioned, defendant City of New York ("New York City"), was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York and acts by and through its agencies, employees and agents, including, but not limited to, the New York City Police Department ("NYPD"), and their employees.

5.      At all relevant times hereinafter mentioned, defendant Joebian Ortiz (Tax 894360), was employed by the City of New York as a member of the NYPD and assigned to Brooklyn South Gang Squad ("BSGS").  Defendant Ortiz is sued herein in his official and individual capacities.

6.      At all relevant times hereinafter mentioned, defendant Alfredo Skelton (Shield 29533), was employed by the City of New York as a member of the NYPD and assigned to the Emergency Service Unit ("ESU"). Defendant Skelton is sued herein in his official and individual capacities.

7.      At all relevant times hereinafter mentioned, defendant William Russo was employed by the City of New York as a member of the NYPD and assigned to Brooklyn South Gang Squad ("BSGS").  Defendant Russo is sued herein in his official and individual capacities.

8.     At all relevant times hereinafter mentioned, defendant Peter Carretta was employed by the City of New York as a member of the NYPD and assigned to Brooklyn South Gang Squad ("BSGS").  Defendant Carretta is sued herein in his official and individual capacities.

9.     At all relevant times hereinafter mentioned, defendant Gary Marcus was employed by the City of New York as a member of the NYPD and assigned to Brooklyn South Gang Squad ("BSGS").  Defendant Marcus is sued herein in his official and individual capacities.

10.     This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331, 1343 and 1367, and 42 U.S.C. § 1983.

11.     Venue is properly laid, pursuant to 28 U.S.C. Section 1391, et seq. in the Eastern District of New York, where the plaintiffs and defendant City of New York reside, and where the majority of the actions complained of herein occurred.


**RELEVANT FACTS**

The Warrant Execution

12.     On May 15, 2014, during the evening hours, each of the plaintiffs was lawfully present inside, or outside and in the vicinity of a three-story private residence located at 641 East 59 Street, in Brooklyn, New York (the "Premises").

13.     On or prior to May 15, 2014, defendant Ortiz and now-retired Det. Timothy Sheridan conducted an investigation relating to the Premises.

3

14.     On or prior to May 15, 2014, Ortiz and/or Sheridan applied for, and obtained, a search warrant that would permit the entry into, and search of, the first floor and basement apartments at the Premises.

15.     These two units were separate apartments within the Premises, which also contained what is believed to be a duplex apartment occupying the second and third floors of the Premises.

16.     On May 15, 2014, the warrant was executed by members of the NYPD, who entered and searched both the basement and first floor units within the Premises.

17.     Members of BSGS arranged for assistance in the execution of the warrant from ESU, and as a result, members of both ESU and BSGS participated in the warrant's execution on May 15, 2014.

18.     During the evening hours of May 15, 2014, various members of the NYPD arrived at the Premises in several NYPD vehicles, immediately following which members of ESU, including Skelton, entered the premises behind shields and with guns drawn, including heavy weaponry.

19.     As the heavily armed ESU officers approached the rear of the building, where the entrance to the basement apartment was located, individuals who were present in the rear of the building heard shouts of "gun" and, unaware that the individuals approaching down a side alley were police officers, ran into the building.

20.     At or about the time of ESU's entry into the Premises, members of ESU and/or BSGS encountered plaintiffs Matthew Nelson, Gary Jeanty, and Billy Hippolyte

outside of the Premises and promptly seized, searched, and handcuffed them.

21.     Upon entry, the ESU officers moved through the crowded units and immediately seized and cuffed every person they encountered inside the first floor and basement units.

22.     By the time they had concluded their search, ESU had seized and cuffed 13 people inside the first floor unit, and another 13 people inside the basement, bringing the total number of persons seized by the defendants to 29.

23.     During the course of their search, ESU often moved people while or after seizing and cuffing them, so that they were placed in locations within the unit other than where they were first encountered by ESU.

24.     While ESU officers were securing the Premises, the BSGS members remained outside, both in front and behind the building.

25.     Once the search was concluded and Premises secured, ESU allowed the BSGS personnel to enter the Premises and take control over the 26 people handcuffed therein. ESU then left the scene.

The Nelson, Jeanty, and Hippolyte Seizures

26.     At no time that evening were Nelson, Jeanty, or Hippolyte engaged in any criminal activity and the only conceivable explanation for their seizure was that they were outside in the vicinity of the home for which the defendants had a search warrant. This proximity was not a lawful basis for the defendants' initial seizure of these plaintiffs.

27.     At no time was there any basis to detain Nelson, Jeanty, or Hippolyte,

much less search and handcuff them, nor was it reasonable for the officers to believe that such a basis existed.

28.     Although the searches of Nelson, Jeanty, and Hippolyte, did not yield any contraband, and despite the absence of any cause to have initially detained these three plaintiffs, the defendants kept these three plaintiffs handcuffed and in custody for a period well in excess of one hour, and until BSGS had completed their search of the first floor and basement units.

29.     For the duration of their prolonged seizure, these individuals were kept in handcuffs outside of the Premises in plain view of all of the BSGS officers at the scene, including the individual defendants, and these defendants were aware of their presence outside the building and the fact that they were in BSGS custody.

30.     In order for the defendants to travel from the first floor unit to the basement apartment, they would have to walk down a side alley from the sidewalk to a driveway behind the backyard of the Premises, where the door to the basement apartment was located.

31.     It was only when BSGS was in the process of withdrawing from the scene – long after ESU had departed – that the defendants finally uncuffed these three plaintiffs and released them from defendants, and did so without issuing any summonses or causing them to be criminally charged.

32.     The detention of Nelson, Jeanty, and Hippolyte was initiated without any legal justification, and there was no justification or objectively reasonable basis for their

continued seizure.

The Arrests Within the Premises

33.    Defendant Russo, who then held the rank of Captain and was assigned to BSGS, was at the Premises during execution of the warrant and, following ESU's withdrawal, was the senior supervising BSGS officer on the scene.

34.    Defendant Carretta, who then held the rank of Lieutenant and was assigned to BSGS, was at the Premises during execution of the warrant and, following ESU's withdrawal, was the second ranking supervising officer on the scene.

35.    Defendant Marcus, who then held the rank of Sergeant and was assigned to BSGS, was at the Premises during execution of the warrant and, following ESU's withdrawal, was the third raking supervising officer on the scene.

36.    Defendant Ortiz was the predetermined "arresting officer" on the scene.

37.    Following ESU's departure, various members of the BSGS, including the individual defendants, entered the Premises, participated in, observed, or received reports about the search of the Premises conducted by BSGS.

38.    During this period of time, the 26 people initially seized and handcuffed by ESU had remained inside the Premises, still cuffed and in the defendants' custody.

39.    It was at about this time that BSGS determined that 25 of the 26 people who were seized and handcuffed would be formally arrested and charged with various

crimes, while one person – Aleisha Walters – was to be released without charges from the scene.

40. These 25 individuals included plaintiffs Milton Sears, David Alcindor, Alonzo Sealey, Sheldon Nyack, Ravin Cox, Zanda Dewar, Ali Kettrles, Herby Aime, Jobe Leemow, Markous Fray, Dwyte Pilgrim, Brandon Thomas, Ryan Clyne, and Lloyd Henry, and ten other individuals who are not parties to this lawsuit.

41. At no time did the defendants have probable cause to arrest any of the plaintiffs, nor was there any reasonable basis for the defendants to believe probable cause existed.

The Charges and Prosecutions

42. These 15 plaintiffs, as well as the 10 other arrested individuals, were transported by the defendants to a local area NYPD station house, where they were formally charged by the defendants.

43. Five of the plaintiffs, Alonzo Sealey, Brandon Thomas, Dwyte Pilgrim, Ryan Clyne, and Lloyd Henry were kept in holding cells at the precinct for a number of hours before they were eventually issued Desk Appearance Tickets ("DATs") which required them to appear in court on September 12, 2014.

44. The DATs were issued based on the knowingly false allegations that each of these plaintiffs was in criminal possession of narcotics, gambling paraphernalia, or other contraband, or had otherwise engaged in criminal conduct, when, in fact, none of these allegations were true, and the defendants knew and understood that there was no basis for these plaintiffs' arrest or the issuance of the DATs.

45.     All of the remaining plaintiffs, as well as various other individuals arrested at the Premises, were transported to Kings County Central Booking ("KCCB"), where they were held in anticipation of arraignment.

46.     While plaintiffs were in defendants' custody, defendant Joebian Ortiz drafted arrest paperwork concerning the arrest of plaintiffs Tevon Thomas, Herby Aime, David Alcindor, Jobe Leemow, and Milton Sears. In this paperwork, Ortiz falsely claimed, in part, that these plaintiffs had jointly possessed more than a pound of marijuana which Ortiz claimed was recovered from a living room closet in the Premises.

47.     This claim by Ortiz was materially false, as none of these plaintiffs had actually or constructively possessed this contraband, and as none of the plaintiffs were present in the room where the closet in which the contraband was found was located, and there was no factual basis for Ortiz to reasonably believe these plaintiffs possessed the marijuana.

48.     While plaintiffs were in defendants' custody, defendant Joebian Ortiz drafted arrest paperwork concerning the arrest of plaintiffs Markus Fray, Sheldon Nyack, Ravin Cox, and Zanda Dewar. In this paperwork, Ortiz falsely claimed, in part, that these plaintiffs had also jointly possessed more than a pound of marijuana, although Ortiz has vacillated as to whether it was recovered from the same living room closet or from a book bag inside a bedroom closet.

49.     This claim by Ortiz was materially false, as none of these plaintiffs had actually or constructively possessed this contraband, and as none of the plaintiffs were present in the room where the closet in which the contraband was found was located, and

there was no factual basis for Ortiz to reasonably believe these plaintiffs possessed the marijuana.

50.     Ortiz further claimed that these plaintiffs (Fray, Nyack, Cox, and Dewar) also possessed a loaded and operable handgun, based on the statement he claimed was relayed to him by defendant Skelton, in which Skelton supposedly claimed to have found the handgun underneath a sweatshirt that was itself underneath plaintiff Fray, after Fray had been placed or ordered to lie down on floor.

51.     These claims were materially false. As the defendants were well aware, some of the plaintiffs were seized in various rooms, hallways, and doorways of the Premises, while others were outside when the defendants arrived. Some or all of these plaintiffs were moved and directed into various rooms immediately upon their seizure by ESU or otherwise prior to or while BSGS's entry into the Premises was occurring, so that BSGS encountered them in different rooms and locations than where ESU had seized them.

52.     Ortiz then forwarded, or caused to be forwarded, these false statements of fact, including the false statements made to support the issuance of the DATs, to the KCDA in order to justify the arrests and to persuade the KCDA to commence the plaintiffs' criminal prosecutions.

53.     Ortiz knew and understood that the KCDA was relying on Ortiz and his fellow officers to provide accurate and truthful information, and not to omit evidence or facts that may be favorable to those persons under arrest, or otherwise withhold information or mislead the KCDA in any way with respect to the facts and circumstances surrounding the arrest of the plaintiffs.

10

54.     Notwithstanding this knowledge, Ortiz lied to the KCDA about where plaintiffs were found, where the contraband was found, and the circumstances of the arrests and searches, in order to fabricate a basis for their arrest and prosecution.

55.     Ortiz is then believed to have spoken with the KCDA and reiterated and confirmed these false statements to the KCDA to justify the arrests and to persuade the KCDA to initiate the plaintiffs' prosecutions.

56.     Based on the fabricated claims of marijuana possession, plaintiffs Tevon Thomas and Herby Aime were each charged with multiple counts of marijuana possession, including at least one felony charge, under docket number 2014KN036196, Milton Sears was similarly charged under 2014KN036188, and David Alcindor and Jobe Leemow under 2014KN036220.

57.     Based on the fabricated claims of marijuana and gun possession, plaintiffs Fray and Nyack were each charged with multiple counts of marijuana and weapons possession, including at least one felony charge, under docket number 2014KN036200, Zanda Dewar was similarly charged under 2014KN036178, and Ravin Cox was charged with gun possession under 2014KN036192.

58.     Notwithstanding Ortiz's best efforts to persuade the KCDA to initiate a criminal prosecution against plaintiff Kettrles, the KCDA eventually declined to prosecute him and he was released from custody after many more hours without being charged.

59.      As a result of these serious felony charges, many of the plaintiffs were detained at KCCB or at a Department of Corrections facility for a lengthy period of hours or days before they were released.

The KCDA's Declination or Dismissal of All Charges

60.     On May 21, 2014, all of the charges for each of the charged plaintiffs (Tevon Thomas, Sears, Alcindor, Nyack, Cox, Dewar, Aime, Leemow, and Fray) were dismissed, and the criminal prosecutions terminated in plaintiffs' favor.

61.     Prior to the return date of the DATs, the Kings County District Attorney ("KCDA") declined to charge these five plaintiffs (Alonzo Sealey, Brandon Thomas, Dwyte Pilgrim, Ryan Clyne, and Lloyd Henry), and the DATs were rejected without being docketed, or were otherwise dismissed.

62.     In short, of the 29 people seized during the search warrant execution at the Premises on May 15, 2014, four were held for a period of time and released from the scene without being charged.

63.     Of the remaining 25 persons, all were processed by the NYPD and presented for arraignment or given DATs based on Ortiz's representations..

64.     The KCDA declined to prosecute many of these 25 people. As for the prosecutions which the KCDA did commence, every single custodial case was dismissed by the prosecution on or before May 21, 2014, and the DATs sometime thereafter..

65.     Thus, within one week of this mass arrest, every single person whom the KCDA had not otherwise refused to prosecute had seen every single charge against him dismissed on the prosecution's own motion.

66.     That at all times relevant herein, the defendants were acting within the scope of their employment, and their acts were done in furtherance of the City of New York's interests and without legal justification or excuse.

## FIRST CAUSE OF ACTION

(Section 1983 Claim for False Arrest by All Plaintiffs
Against Individual Defendants Russo, Carretta, Marcus, and Ortiz)

67.     Plaintiffs repeat the allegations contained in the preceding paragraphs above as though stated fully herein.

68.     The individual defendants willfully and intentionally seized, searched, detained, and arrested the plaintiffs without probable cause, and without a reasonable basis to believe such cause existed.

69.     The initial seizure of plaintiffs Nelson, Jeanty, and Hippolyte was made without any lawful basis, as the defendants encountered three plaintiffs outside of the building within which the search warrant was to be executed and were not engaged in any activity that would justify their seizure, nor would it have been reasonable to believe that their seizure was warranted.

70.     The named individual defendants, i.e., all but defendant Skelton, were aware of the seizure of these three plaintiffs at the moment that they were occurring, yet they took no steps to intervene in the seizure in any way, nor did they take any steps to prevent the handcuffing from occurring or continuing, nor did they take any steps to limit the continuing seizure and detention of these three plaintiffs in handcuffs outside of the Premises, despite the absence of any lawful basis for the initial seizure, much less said detention and arrest.

71.     Defendant Russo has acknowledged that he witnessed members of BSGS seizing the individuals, and that he was aware that they were handcuffed during and

after ESU's securing of the Premises, as well as during BSGS's search of the Premises after ESU's departure.

72.     Russo, Carretta, and Marcus were the BSGS supervisors on the scene and were responsible for the actions undertaken by the BSGS members present, as well as their failures to act, including their failure to intervene in the initial and ongoing seizure and detention of these three plaintiffs.

73.     The supervisory officers knew and understood that there were people in custody and handcuffs outside of the building who had been seized for no reason other than their proximity to a building inside of which the defendants intended to execute a search warrant, and failed to take any steps to protect these individuals from being unlawfully detained and held in handcuffs.

74.     Similarly, Ortiz was the pre-determined arresting officer on the scene and was responsible for investigating and gathering information as to execution of the warrant, including the identity of each person seized pursuant to the warrant seizure, an inventory of any contraband or evidence found threat, and the locations of both each item of contraband recovered and each person seized.

75.     Each of these individual defendants knew and understood that the Nelson, Jeanty, and Hippolyte were being held in custody and each failed to take any steps of any sort to intervene in this detention or otherwise limit the ongoing unlawful seizure, despite ample opportunity to do so.

76.     The defendants further knew and understood that they could not say where within either unit of the Premises ESU had encountered any of the plaintiffs when

14

they entered the building or whether some or all of the plaintiffs had been moved by ESU from where they had first been found prior to BSGS's later entry into the Premises.

77.     ESU, in the regular course of business, creates and maintains records in which its officers document whom they encountered during a warrant execution, the room in which each person was found, and the ESU officer who seized each individual.

78.     While ESU memorialized this precise information in this case, neither Ortiz nor the other individuals in BSGS, made any effort to determine where within the Premises each of the plaintiffs was found by ESU.

79.     The defendants lacked any basis to believe that any of the plaintiffs were ever in the same room or part of the Premises where the BSGS claim to have recovered contraband or were engaged in any criminal conduct, and, in fact, deliberately failed to make the most basic of inquiries of ESU as to the location and circumstances of each plaintiff's seizure.

80.     Instead, the defendants simply arrested each person within the Premises and then later fabricated evidence to justify each person's arrest and to otherwise seek their prosecution.

81.     The municipal defendant and Ortiz have affirmatively admitted that the decision to arrest each of the plaintiffs was made solely by Ortiz and then verified by his Sergeant, Gary Marcus. For his part, William Russo, the senior supervisory officer on the scene has since challenged the defendants' earlier admission, stating that he personally made the decision to arrest each of the plaintiffs, and the remaining individuals, after consulting with defendants Carretta and Marcus.

15

82.     In any event, these defendants personally participated in the decision to arrest each of the plaintiffs, and, as there was no probable cause for these arrests, or any reasonable basis to believe such cause existed, the individual defendants, individually and collectively, subjected the plaintiffs to false arrest and imprisonment, and thereby violated and aided and abetted in the violation of the plaintiffs' rights under the Fourth Amendment of the United States Constitution.

83.     At no time did any of the individual defendants make any reasonable attempt to intervene in the unconstitutional conduct of their fellow officers, and thus further facilitated and tacitly encouraged the continuation of the misconduct.

84.     By reason thereof, the individual defendants have violated  42 U.S.C. §1983 and caused each of the plaintiffs to suffer emotional and physical injuries, mental anguish, incarceration and the deprivation of liberty, and the loss of their constitutional rights.

## SECOND CAUSE OF ACTION

(Section 1983 Claim for False Arrest, Denial of a Fair Trial, and
Malicious Prosecution by Markous Fray Against Individual Defendant Skelton)

85.     Plaintiff Markous Fray repeats the allegations contained in the preceding paragraphs above as though stated fully herein.

86.     According to Ortiz, defendant Skelton told him that he found a handgun underneath a sweatshirt that was itself underneath plaintiff Fray.

87.     Skelton has denied under oath that he found the handgun in question,

16

or any handgun during the search, and further denies that he told Ortiz that he had found the weapon.

88.     In the event that Skelton is lying and Ortiz is telling the truth, and thus Skelton did claim to have discovered the weapon, or any other item, under Fray at, or about the time that he handcuffed Fray, Skelton knew that this item did not belong to Fray by virtue of the fact that Skelton had observed it thrown from another part of basement during the entry and witnessed it landing near Fray moments before Fray was ordered to lie down near the item.

89.     By withholding the facts and circumstances surrounding Skelton's purported recovery of the handgun from Ortiz, Skelton created a materially false version of events surrounding the alleged handgun and Markous Fray's alleged possession thereof, and thereby subjected Markous Fray to false arrest and imprisonment.

90.     In addition, Skelton knowingly caused said factual misrepresentations and fabrications to be relayed to the KCDA for the purpose of initiating the prosecution of Markous Fray, for which there was otherwise no probable cause, and which caused plaintiff to suffer the deprivation of liberty, and as a result caused Markous Fray to be subjected to the denial of a fair trial and to be maliciously prosecuted.

91.     By reason thereof, defendant Skelton violated  42 U.S.C. §1983 and caused Markous Fray to suffer emotional and physical injuries, mental anguish, incarceration and the deprivation of liberty, and the loss of his constitutional rights.

## THIRD CAUSE OF ACTION

(Section 1983 Claim for Malicious Prosecution and Denial of a Fair Trial
by Plaintiffs Tevon Thomas, Milton Sears, David Alcindor, Alonzo Sealey,
Sheldon Nyack, Ravin Cox, Zanda Dewar, Herby Aime, Jobe Leemow,
Markous Fray, Dwyte Pilgrim, Brandon Thomas,  Ryan Clyne, and Lloyd Henry
Against Individual Defendants Russo, Carretta, Marcus, and Ortiz)

92.     Plaintiffs repeat the allegations contained in the preceding paragraphs above as though stated fully herein.

93.     The defendants fabricated evidence through the false statements of Ortiz with respect to the claims that the plaintiffs were in possession of various items of contraband or otherwise engaged in criminal conduct, and forwarded these fabrications to the KCDA for the purpose of initiating and continuing the plaintiffs' prosecution.

94.     As a result of defendants' fabrications, omissions, and materially misleading and factually inaccurate representations to the KCDA, criminal prosecutions were initiated against these plaintiffs, or DATs otherwise issued, resulting in the deprivation of the plaintiffs' liberty, including post-arraignment jailing of several of the plaintiffs for a period of days.

95.     Moreover, the defendants further caused the plaintiffs to be maliciously prosecuted by knowingly subjecting them to criminal process without probable cause.

96.     To the extent that any of the individual defendants did not personally participate in the fabrication of evidence or communications about said evidence with the KCDA, these individual defendants were aware that the arrests were made without probable cause, and were equally aware that Ortiz and/or other officers fabricated evidence or communicated a materially misleading or falsified version of the facts to the KCDA, and, despite ample opportunity to do so, failed to intervene in the unconstitutional conduct of

their fellow officers, and thus further facilitated and encouraged the continuation of the misconduct.

97.     By so doing, the individual defendants, individually and collectively, subjected the plaintiffs to the denial of a fair trial and malicious prosecution, and thereby violated and aided and abetted in the violation of the plaintiff's rights under the Fourth, Sixth, and Fourteenth Amendments of the United States Constitution.

98.     By reason thereof, the individual defendants have violated  42 U.S.C. §1983 and caused the plaintiffs to suffer emotional and physical injuries, mental anguish, incarceration and the deprivation of liberty, and the loss of their constitutional rights.

## FOURTH CAUSE OF ACTION

(Section 1983 *Monell* Claim by All Plaintiffs
Against the Municipal Defendant)

99.     Plaintiffs repeat the allegations contained in the preceding paragraphs above as though stated fully herein.

100.     Defendant City of New York was responsible for ensuring that reasonable and appropriate levels of supervision were in place within and/or over the NYPD.

101.     Ortiz's actions in this matter – condoned by and carried out with the approval of the other defendants – were carried out in accordance with an existing plan or policy created or otherwise condoned by the municipal defendant designed to increase the number of arrests made without regard to probable cause.

102.     The purpose of this policy or plan was to generate large numbers of

arrests to help the NYPD create a false impression of positive activity by their officers.

103.    Ortiz and members of his BSGS had a demonstrated history of making wholesale arrests of all persons found inside of apartments or homes while executing search warrants, without probable cause to make such arrests, as the municipal defendant was well aware.

104.    For instance, on April 13, 2011, Ortiz, along with his then-partner Timothy Sheridan, and accompanied by defendant Carretta and other members of the BSGS, entered a home on East 56 Street in Brooklyn, New York, and arrested numerous individuals on falsified claims that they all possessed marijuana or a stun gun or other contraband. These charges were later dismissed and resulted in numerous lawsuits, including the following EDNY actions brought by 16 of the falsely arrested individuals: *Nelson, et al., v. City of New York*, et al., 12 CV 519 (KAM) (JMA), *Turner v. City of New York, et al.*, 13 CV 3705 (ARR) (LB), *Mojica, et al., v. City of New York, et al.*, 14 CV 2399 (PKC) (RER), *Dewar, et al, v. City of New York, et al.*, 14 CV 2400 (PKC) (RER), *Laguerre v. City of New York, et al.*, 14 CV 2409 (PKC) (RER), *Bryant v. City of New York, et al.*, 14 CV 2410 (PKC) (RER), which were settled for a total amount of $315,000.

105.    The above actions represent but a small fraction of the lawsuits filed against Ortiz and other members of his BSGS team, of which Carretta was a long time supervisor, and which reflect the unit's proclivity for making warrantless arrests during search warrant executions.

106.    In addition, members of the Gang Division were, at all relevant times herein, evaluated, at least in part, on the basis of their "activity" which is measured by the number of arrests made, search warrants secured, and other, similar criteria. Thus, members

of the Gang Division routinely make arrests and engage in other police activity without sufficient legal cause in order to raise their levels of "activity" and improve the perception of their job performance.

107.    The NYPD generally, and BSGS in particular, tracks the number of arrests made by each officer but does not take into account the outcome of these arrests, even though this information is available to the NYPD. As a result, members of the Gang Division are well aware that (a) they are being evaluated based on, in large part, the number of arrests made, and (b) their supervisors do not care whether these arrests lead to criminal prosecutions, much less convictions.

108.    More precisely, under this policy or plan, officers are encouraged or pressured to make as many arrests as possible, which has caused and will continue to cause, its officers, including the individual defendants and their colleagues, to make arrests regardless of whether there was any factual basis for the charges.  The officer(s) would then fabricate claims of having seen the person(s) being arrested in possession of weapons or illegal narcotics or otherwise engaged in criminal activity.

109.    Upon information, this policy was in existence as of April 4, 2014, as codified in an October 17, 2011, Police Officer Performance Objectives Operation Order in which NYPD Commissioner Kelly directed all commands that, "Department managers can and must set performance goals" relating to the "issuance of summons, the stopping and questioning of suspicious individuals, and the arrests of criminals."

110.    Upon information and belief, that same Operation Order stated, "uniformed members. . . .Who do not demonstrate activities . . . or who fail to engage in proactive activities . . . will be evaluated accordingly and their assignments re-assessed."

111.     In the case of *Floyd v City of New York*, 813 F. Supp. 2d 417, 448

(S.D.N.Y.) on reconsideration, 813 F. Supp. 2d 457 (S.D.N.Y. 2011), United States District

Judge Shira A. Scheindlin denied the City of New York's motion for summary judgment, in

part, based on evidence that the NYPD had a widespread practice of imposing illegal stop

and frisk, summons, and arrest quotas on officers. The evidence cited in *Floyd*, included

testimony from various officers, audio recordings of roll call meetings in which precinct

commanders issued orders to produce certain numbers of arrests, stops and frisks, and

summonses, and a labor grievance on behalf of six officers and one sergeant who were

transferred out of the same 75 precinct where plaintiff was arrested for allegedly failing to

meet a monthly ten-summons quota.  In January 2006, a labor arbitrator found that this same

75 precinct had imposed summons quotas on its officers in violation of New York State

labor laws.

112.     In another Southern District of New York case, *Schoolcraft v. City of New

York*, 10 CV 6005 (RWS), the plaintiff, a police officer assigned to Brooklyn's 81 precinct

alleged that precinct commanders and supervisory personnel expressly imposed arrest and

summons quotas, and explicitly directed officers to "arrest and summons fully innocent

people" and then come up with a justification later.

113.     In 2012, Police Officer Craig Matthews commenced *Matthews v. City of

New York*, 12 CV 1354 (BSJ) in the Southern District of New York, alleging that his

complaints that the existing quota system was leading to unjustified stops and arrests, and

thereby causing damage to the department's relationship with the local community led to his

termination. There was little dispute that he made these complaints or that they were well

founded. *See Matthews v. City of New York*, 779 F.3d 167, 169 (2d Cir. 2015).

114.     That this plan is still in effect is reflected in a class action suit apparently filed in August 2015 by various police officers alleging that the NYPD still requires officers to meet fixed numerical goals for arrests and court summonses each month, according to a New York Times article published February 18, 2016, which can be found online at http://nyti.ms/1R9FCGu.

115.     The policy or plan was kept in effect through the date of plaintiffs' arrest, despite the municipal defendant's knowledge that county prosecutors were often not charging the individuals arrested, or otherwise not actively pursuing their prosecutions, or that there was insufficient evidence to justify the arrests and illegal searches, or that the arresting officers were seeking to bolster the arrests with false allegations, and that the prosecutors often had found insufficient cause to justify the imposition of charges or continued prosecution if charges were filed.

116.     In this case, even if the individual defendants did recover contraband, they engaged in mass arrests of plaintiffs without probable cause as part and parcel of this policy designed to boost their productivity numbers, and then fabricated evidence to attempt to justify the arrests and promote the initiation of the plaintiffs' prosecution.

117.     At no time did any of the individual defendants make any reasonable attempt to intervene in the unconstitutional conduct of their fellow officers, and thus further facilitated and tacitly encouraged the continuation of the misconduct, and thereby confirmed the existence of this policy.

118.     By reason thereof, the municipal defendant has violated 42 U.S.C. §1983 and caused the plaintiffs to suffer emotional and physical injuries, mental anguish, incarceration and the deprivation of liberty, and the loss of their constitutional rights.

## DEMAND FOR A JURY TRIAL

Pursuant to Fed. R. Civ. P. 38, plaintiffs hereby demand a jury trial of all issues capable of being determined by a jury.

WHEREFORE, the plaintiffs demand judgment against defendants jointly and severally as follows:

i.     on causes of action one through three, actual and punitive damages in an amount to be determined at trial;

ii.    on the fourth cause of action, actual damages in an amount to be determined at trial;

iii.   statutory attorney's fees pursuant to, *inter alia*, 42 U.S.C. §1988 and New York common law, disbursements, and costs of this action; and

iv.    such other relief as the Court deems just and proper.

Dated:   New York, New York
         May 18, 2016

LUMER & NEVILLE
Attorneys for Plaintiffs

By:   _____
      Michael Lumer, Esq.
      225 Broadway, Suite 2700
      New York, New York 10007
      (212) 566-5060